Laurent R.G. Badoux (AZ Bar No. 020753)
LBadoux@Buchalter.com
Steven R. Schneider (AZ Bar No. 030958)
SSchneider@Buchalter.com
BUCHALTER, a Professional Corporation
16435 North Scottsdale Road, Suite 440
Scottsdale, AZ  85254-1754
Telephone: (480) 383-1800
Fax: (480) 824-9400
*Attorneys for Plaintiffs*

# UNITED STATE DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Martin Gillard; Darren Gurner,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Good Earth Power AZ, LLC, an Arizona limited liability company; ZR FEC Ltd., a BVI company; Jason Rosamond and Maya Minkova, husband and wife; Alawi Zawawi; Good Earth Power Ltd., a British Virgin Islands company; FEC Logging USA Holdings, LLC, a Delaware limited liability company<br><br>                    Defendants. | Case No. 2:17-cv-01368-DLR<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: CONTRACT CLAIMS [DOC. 67]**<br><br>**(Oral Argument Requested)** |

        Plaintiffs Martin Gillard and Darren Gurner (collectively, "Plaintiffs") hereby file their Response to Defendants' Motion for Partial Summary Judgment Re: Contract Claims [Doc. 67]. This Response is supported by the following Memorandum of Points and Authorities, the concurrently-filed Controverting Statement of Facts ("CSOF"), the exhibits thereto, and all matters of record.

## MEMORANDUM OF POINTS AND AUTHORITIES

        On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## I.     INTRODUCTION

Defendants move the court for partial summary judgment on the six contract claims raised in this action.

Defendants contend that, although his contract was seconded to GEPAZ/ZR FEC, Gillard was only employed by GEP Ltd, an entity for which he did no work for more than two years.  When he was seconded to work on the 4-FRI Contract to GEPAZ/ZR FEC, those entities became responsible for payment of the wages owed to him.  As proof that Defendants were his employers, Rosamond arrange to make some back payments of owed wages and unreimbursed business expenses to Gillard from December 2016 to April 2017, all of which came from the bank accounts controlled by GEPAZ/ZR FEC.

Defendants also contend that Gurner was a consultant of Marlin Wood.  They disingenuously claim that Gurner admitted he was not an employee.  Gurner has consistently maintained, supported by an extensive written discussion, that he was appointed Managing Director of ZR FEC/GEPAZ in early 2014, thereby ending his consultancy agreement with GEP Ltd.  Following that appointment, GEPAZ, not GEP Ltd. paid his wages, as further proof of his on-boarding.

Therefore, Plaintiffs must be allowed to present their contract claims to a jury.

## II.     FACTUAL BACKGROUND

GEPAZ LLC holds a 10-year public forest management contract with the US Forest Service (Four-Forest Restoration Initiative or "4-FRI Contract"), authorizing the company to access and thin federal forests, including logging, milling, transportation, soils, biomass and other components relating to an area covering most of northern Arizona to the New Mexico border. It took over that contract in 2013.  GEPAZ, at the time, was controlled by the individual named Defendants, who served as its directors and/or agent, and owned at least in part by Rosamond and Zawawi. They later created ZR FEC Ltd. to hold a controlling stake in GEPAZ.  Minkova and Rosamond maintained CFO and CEO

status for all three entities, and not only controlled the corporate defendants but at least eight other entities handling various parts of the 4-FRI contract fulfillment.

**Plaintiff Gillard:**

Gillard signed an employment agreement in February 2013 to be CTO of GEP Ltd., when it was pursuing business opportunities in Africa. Rosamond and Minkova asked Gillard, a British national based in England, to provide assistance on preliminary work for the 4-FRI Contract in early 2014. CSOF ¶9. Within a few months, Gillard was working full time on the 4-FRI Contract, and was seconded to the new US-based entity responsible for the 4-FRI Contract. Gillard understood that his salary would be paid via revenues generated from Arizona and the new entity would step in the shoes of GEP. Gillard did not enter into a consultancy agreement with ZR FEC or GEPAZ. CSOF ¶10.

Although promised a salary of no less than $17,500/month, Gillard did not receive timely or complete payments. Gillard had to adjust to receiving only sporadic payments, but he never agreed to a reduction in his salary. From 2014 to the end of 2016, Gillard received payments from various bank accounts in always varying amount. CSOF ¶ 11-12.

Gillard had different roles in conjunction with Arizona operations, including COO. Gillard's wages were not paid via regular payroll checks, subject to withholdings. Gillard began work in Arizona with the understanding he had been seconded to work on the operations required for fulfillment of the 4-FRI Contract but was never given a formal secondment agreement to indicate which entity assumed the obligation to pay him. While seconded, Minkova, Rosamond and Zawawi controlled all Arizona operations and decided from one pay period to the next how much Gillard would be paid. CSOF ¶¶14-15.

**Plaintiff Gurner:**

Rosamond asked Gurner to provide consultancy services to GEP Ltd. around October 2013. CSOF ¶22-23. From November 2013 to January 2014, Gurner provided consultancy services to GEP Ltd. at a rate of £10,000 per month. At the end of January

2014, Rosamond and Gurner agreed on terms of an employment relationship, according to which Gurner would become Managing Director of the soon-to-be-created Arizona entity (GEPAZ/ZR FEC).  CSOF  ¶23-24.  Gurner's salary was set at £12,500/month plus incentives, but he was never paid these amounts in full and was sometimes paid nothing. CSOF ¶ 24.  As a result, he performed projects for an unrelated banking entity to palliate for unpaid wages.  Gurner held the title of Managing Director throughout. CSOF ¶ 25.

Gurner issued Marlin Wood invoices of £10,000 a month to GEP for three (3) months, before being appointed Managing Director.  He expected to be paid his salary by his new employer upon his appointment, per his agreement with Rosamond. Because he was informed that neither GEPAZ nor ZR FEC would create a payroll account, he continued to issue invoices under Marlin Wood for his wages.  However, Gurner's tax advisor informed him he would be liable in the UK for taxes on invoiced amounts, even if not paid, which created significant tax liability for him for 2014.  CSOF ¶ 40.  Issuing invoices that were not getting paid meant he was paying for the privilege of working for GEPAZ, so Gurner stopped issuing invoices in 2015. Yet, GEPAZ continued to pay him, albeit sporadically, from its business accounts. GEPAZ generally paid Marlin Wood for Gurner's salary, but paid Gurner directly for expense reimbursements.  CSOF ¶¶ 40-1.

By the end of their tenure, Plaintiffs were each owed in excess of half a million US Dollars in back wages, not including other compensations.  Rosamond informed Gillard he would be terminated in November 2016.  In conjunction with that announcement, Rosamond recognized that Gillard was owed extensive back wages and began making payments to him of $3,750 every two weeks, starting the first week of December 2016, from either the Seymour Forest Product or Lumberjack business accounts, two entities under the ZR FEC/GEPAZ umbrella and engaged in the fulfillment of the 4-FRI Contract. The payments became infrequent after January 2017, and only one payment was made in each of the months of March and April, after which they stopped completely.

## III.  ANALYSIS

Defendants concede that their services were initially secured by GEP Ltd., which is controlled and managed by the same executive team, Minkova and Rosamond, that controls GEPAZ/FR-FEC. Those initial arrangements, however, were modified, upon the impetus of Minkova and Rosamond.  The foregoing analysis will show that (A) Plaintiffs had a contractual employment relationship with the GEPAZ/ZR FEC, in that Gillard was seconded to GEPAZ/ZR FEC and Gurner was hired as Managing Director of GEPAZ and its operations entity (which ultimately turn out to be ZR FEC); (B) Arizona law, not British law applies to the contract claims; and (C) their claims are timely.

### A.  Plaintiffs Had Recognizable And Defined Contractual Relationships With GEPAZ/ZR FEC.

As expressly stated in A.R.S. 23-1501(a)(1), "[t]he public policy of this state is that: the employment relationship is contractual in nature."  An employment contract can exist under Arizona law without being reduced to writing. *See* A.R.S. 23-1501(a)(2); *Redhair v. Kinerk, Beal, Schimdt, Dyer & Sethi, P.C.*, 183 P.2d 544 (App. 2008) (oral contract for referral fee was enforceable and constituted an employment contract). Similarly, it can implied from the Parties' course of action. As further explained below, Plaintiffs are properly considered employees of Corporate Defendants, even if their employment relationship was not memorialized in a written document, especially since the ambiguity was created by Minkova and Rosamond.

Defendants contend that Gillard was under contract with GEP Ltd., not any of the present Defendants.  They also claim that, if Gurner had any contract, it was one for consultancy via Marlin Wood.  Yet, the evidence is clear that the contracts Defendants refer to were abandoned by the Parties as their relationships evolved and were replaced by bona fide contractual employment relationships, which can be ascertained through a combination of communications and review of the Parties' conduct.  Indeed, throughout

their moving papers, Defendants conveniently claim that GEPAZ and FR-FEC were not employers for purposes of their argument, yet in other parts of these moving papers, they claim Plaintiffs were not only employees, but high-level executive, overtime-exempt ones. The Court should not accept their changing characterizations to avoid clear liability.

First, Rosamond has consistently treated and referred to Plaintiffs as employees of GEPAZ/ZR FEC. In November 2014, shortly after Gillard has been seconded to Arizona, he informed Gurner (then Managing Director of GEPAZ) that he would discount Gillard's salary because of operational issues in Arizona. CSOF ¶ 58 (App. H). In the same communication, Rosamond also refers to Gurner's compensation as a salary. *Id.*[1] In March 2016, Rosamond unequivocally indicated that both Plaintiffs were employees of ZR FEC and that ZR FEC, as operational arm of GEPAZ, was responsible for payment of wages owed to Plaintiffs. CSOF ¶ 42 (Appendix J) (on March 29, 2016, Rosamond instructed Gurner on preparation of investor materials as follows: "Do not list outstanding payments owed to employees Darren, Jason, Martin and Maya. This is a debt owed by ZR FEC, not by [entities] below ZR FEC."). Likewise, around the same time frame, GEPAZ represented to the federal government, in an application for an L-visa for signed by Rosamond, that Gillard was a well-compensated, managerial level employee (COO) of GEPAZ, CSOF ¶ 47 (App. I), and to the DOL in conjunction with an on-site FLSA investigation. CSOF ¶ 69 (App. A). Last but not least, after indicating to Gillard he was being let go from employment, Rosamond, acting as CEO of GEPAZ/ZR FEC ensured that Gillard received payment of some of the outstanding balance of wages he was owed, from December 2016 to April 2017. These payments did not come from GEP Ltd. but came instead from Arizona bank accounts. CSOF ¶ 51, 57 (App. C). As discussed in other papers, FR-FEC and GEPAZ are part of a single enterprise and co-contractors under

---

[1] Payments to Gurner consistently came from GEPAZ's Wells Fargo bank account. CSOF ¶ 58 (App. D).

the 4-FRI Contract.  Rosamond does not indicate in that communications that Plaintiffs are employees of GEP Ltd. or independent contractor(s), because they in fact were not. The understanding of the Parties, demonstrated by both internal and external communications and payment of wages (and other economic realities discussed in other moving papers) show that no matter how Plaintiffs came to the attention of GEPAZ/ZR FEC, their status was one of a contractual employment relationship. These representations are sufficient to establish the existence of an employment agreement as defined under Arizona law between Plaintiffs and Defendants.  *See Blood Systems, Inc. v. Roesler*, 972 F. Supp. 2d 1150 (D. Ariz. 2013).

Second, Plaintiffs received payments from Arizona sources, not GEP Ltd. CSOF ¶ 57-58. This further shows the existence of an employment relationship in Arizona.

Third, it is clear as to Gurner that he and Rosamond agreed to clear employment terms as far back as January 2014, for Gurner as Managing Director of GEPAZ/ZR FEC, abandoning the GEP Ltd. consultancy role, which served exclusively as an audition for the MD role. CSOF ¶ 22-26 (App. F).

Thus, although Defendants would love to escape liability by contending that no contractual relationship existed between them and Plaintiffs, the reality demonstrates otherwise.  Certainly, as a matter of summary judgment, the mountain of evidence supporting the Plaintiffs' legitimate perception that they were involved in a contractual employment relationship with Arizona Defendants completely forecloses summary judgment on those issues.

**B.     Arizona Law, Not British Law Applies.**

Defendants contend that, because Gillard's agreement with GEP Ltd. contains a choice of law provision, the laws of England and Wales apply to Gillard's agreement, relying upon *Swanson v. The Image Bank, Inc.*, 77 P.3d 439 (Ariz. 2003).  As discussed in conjunction with Defendants' motion for summary judgment on Plaintiff's Arizona Wage

Act claims, under a conflict of law analysis, even if Gillard were pursuing a claim under his original agreement, which he is not, the selection of England and Wales as the law of the contract would not impact Gillard's right to bring this action, and it would not apply to Gurner's contract claim, since it is unequivocal that his consultancy agreement was not in play beyond 2013.[2]

In this situation, Gillard was seconded to an Arizona entity, performed work for fulfilment of the local 4-FRI Contract, relocated to Arizona and was paid wages and regarded as an employee of the Arizona entities; thus, only the state or Arizona maintains a nexus with the action at issue. Once seconded, the choice of law provision lost its nexus to the selected jurisdiction. *See* Restatement (2nd) Conflict of Laws §187 (noting absence of geographic nexus as reason to disregard contractual choice of law provision even if clause at issue is properly within ambit of provision).

Further, the state of Arizona has a strong public policy interest in regulating work performed in its jurisdiction. Even if Gillard's work was performed for a foreign entity, which it objectively was not, that foreign entity could not impose its employment laws upon the state of Arizona or implement provisions that would contravene public policy, such as the requirement to pay wages in a consistent and timely manner. Gillard provided services in Arizona to Arizona entities, for the fulfilment of a contract of significant public interest to the state of Arizona, while being paid wages in Arizona. The public policy at issue here is a much more significant factor than the one discussed in *Swanson*, which involved penalty on a one-time severance claim issue, because it is about protecting local workers from wage abuses. *See* A.R.S. §23-351(A) and (B) (provisions of Wage Act setting obligations for timely and accurate payment of wages).[3]

---

[2] Further, a British employer would not be at liberty to unilaterally modify terms of an employment agreement and would be in breach under British labor law for failing to pay promised wages timely and fully.

[3] To the extent Defendants contend it was proper to agree to a "deferral" of the payment of wages, since such an agreement is in violation of Arizona public policy, it could not be the

Thus, allowing the choice of law provision Defendants invoke would be contrary to a "fundamental policy" of the state of Arizona (i.e., that an employee should have the benefit of knowing with certainty when and how much he/she will be paid), which has a "materially greater interest" in its enforcement than Britain would. Restatement (2nd) Conflict of Laws §187(2)(b). As a result, even if a choice of law provision could be inferred in the contractual relationship between Gillard and GEPAZ/ZR FEC, that provision would be ineffective and Arizona law should apply to this analysis.

Lastly, the creation of a new employment relationship, contractual in nature, between the Arizona Defendants and Plaintiffs for work in Arizona renders the prior agreement of no application in this analysis and makes British law inapposite.

### C.   The Statute Of Limitations Under The Wage Act Allows Recovery Of All Unpaid Wages

Without any supporting citation,[4] Defendants contend that the statute of limitations precludes recovery of unpaid wages outside of a one-year look back window from the date of filing of the lawsuit (plus private tolling agreement). That assertion is incorrect. Only the statutes of limitations of the FLSA operate as look back windows. Arizona statutes of limitations, including under the Minimum Wage Act, require that an action be brought within one year of its accrual, but does not cap the period of time covered by the claim. Nothing in the Wage (Payment) Act or A.R.S. §12-541 suggests that the limitations at issue functions in any other way than a traditional statute of limitations.

Defendants were let go in late 2016 (Gurner in October; Gillard in November). It is at that time, when their employment ends and they are not made whole for outstanding

subject of a lawful agreement under Arizona law.

[4] Defendants cite *Redhair*, 183 P.2d at 544. Although that case indeed holds that a one-year statute of limitations apply to a verbal employment contract, per A.R.S. §12-541(3), the claim arose in December 2004 and the plaintiff did not file until August 2006 (¶¶ 3-4), which resulted in a determination that the statute had lapsed. It is therefore inapposite since Plaintiffs filed well before one year from the termination.

wages in a timely manner (within the next pay period), that their claim for untimely payment of wages accrues. *Fallar v. Compuware Corp.*, 202 F. Supp. 2d 1067 (D. Ariz. 2002) (holding that the one-year period for bringing an employment claim under Section 12-541(3) only begins to run upon employee termination); *See Apache East, Inc. v. Wiegand*, 580 P.2d 769 (App. 1978) (upholding award of treble damages in an action brought within one year from termination for unpaid commissions stretching over two years). Thus, by filing in May 2017, Plaintiffs are well within the traditional one-year statute of limitations applicable to employment agreements under Arizona law and are therefore entitled to recover all unpaid wages relating to their employment agreements with Defendants.

Furthermore, even if the statute could be construed as Defendants suggest, their repeated assurances they would ultimately correct the situation would constitute either estoppel or would warrant a measure of equitable tolling to allow Plaintiffs to raise their claims having been affirmatively promised to be made whole throughout the course of their employment.

## IV.    CONCLUSION

For these reasons, the Court should deny Defendants' Partial Motion for Summary Judgment on Plaintiffs' Contract Claims.

**DATED** this 31st day of July, 2018.

BUCHALTER,
 A PROFESSIONAL CORPORATION


By:   */s/ Laurent R.G. Badoux*
        Laurent R.G. Badoux, Esq.
        Steven R. Schneider, Esq.
        LBadoux@Buchalter.com
        SSchneider@Buchalter.com
        *Attorneys for Plaintiffs*

BUCHALTER
A PROFESSIONAL CORPORATION
SCOTTSDALE

BN 33601538v1

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and mailed a copy of same to the following if non-registrants, this 31st day of July, 2018, to:

Robert A. Shull, Esq.
rshull@dickinsonwright.com
Amanda E. Newman, Esq.
anewman@dickinsonwright.com
Dickinson Wright, PLLC
1850 N. Central Avenue, Suite 1400
Phoenix, AZ  85004
*Attorneys for Defendants Good Earth Power AZ, LLC,
ZR FEC Ltd., Jason Rosamond, and Maya Minkova*

Joshua T. Greer, Esq.
jgreer@law-msh.com
Moyes Sellers & Hendricks Ltd.
1850 N. Central Avenue, Suite 1100
Phoenix, AZ 85004
*Attorneys for Defendant Good Earth Power AZ, LLC*

*/s/ Lori Harpel*

BUCHALTER
A PROFESSIONAL CORPORATION
SCOTTSDALE

BN 33601538v1